UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

RGI BRANDS LLC,                                    :

               Plaintiff,           :           12 Civ. 1369 (LGS) (AJP)

       -against-                         :           **REPORT AND RECOMMENDATION**

COGNAC BRISSET-AURIGE, S.A.R.L.,                   :

             Defendant.           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Lorna G. Schofield, United States District Judge:**

      Plaintiff RGI Brands ("RGI") brought this action against defendant Cognac Brisset-Aurige ("CBA") seeking damages for, inter alia, breach of the parties' distribution agreement.  (Dkt. No. 1: Compl.)  CBA counterclaimed that RGI unlawfully registered and used CBA's trademarks in the United States.  (Dkt. No. 14: Ans. & Counterclaims.)  Presently before the Court is RGI's motion for a default judgment and damages.  (Dkt. No. 32: Notice of Motion.)

      For the reasons set forth below, RGI's motion should be <u>GRANTED</u> as modified herein, judgment should be entered for RGI against CBA on default for damages of $57,940 plus interest and costs, and CBA's counterclaims should be dismissed with prejudice.

<u>BACKGROUND</u>

**<u>Procedural History</u>**

      On April 30, 2012, Judge Jones referred this matter to me for general pretrial purposes.  (Dkt. No. 3: 4/30/12 Referral Order.)  On January 29, 2013, I granted CBA's counsel's motion to withdraw on consent, and issued the following Order:

1.      Counsel's motion to withdraw (Dkt. No. 24), on consent of the defendant, is GRANTED.

. . . .

3.      A corporation cannot appear pro se but must be represented by counsel.

4.      Plaintiff is to move for a default and submit proof of damages (or for other relief) for inquest . . . .

(Dkt. No. 27: 1/29/13 Order; see Dkt. No. 29: 2/11/13 Memo Endorsed Order.)

On February 20, 2013, RGI moved for a default judgment and filed inquest papers.

(Dkt. No. 32: Notice of Motion; Dkt. No. 33: Paltrowitz Aff.; Dkt. No. 34: Rapp Aff.; Dkt. No. 35: RGI Br.)  On February 25, 2013, CBA submitted a letter to the Court with attachments responding to RGI's inquest submissions.  (Dkt. No. 37: 2/25/13 Letter.)  On March 4, 2013, I endorsed CBA's submission as follows:  "Defendant cannot appear except through counsel.  If you [CBA] wish to contest the inquest, you must be represented by an attorney."  (Dkt. No. 38: 3/4/13 Order.)  No further submissions were received.  On March 11, 2013, this matter was reassigned to Judge Schofield.  (Dkt. No. 39: Notice of Case Reassignment.)

**The Complaint**[1]

RGI seeks monetary damages arising from, inter alia, CBA's alleged breaches of the parties' exclusive distribution agreement, including, damages for "lost sales" of  "at least . . . $250,000."  (Dkt. No. 1: Compl. ¶¶ 75-78, 83-85; see also Dkt. No. 33: Paltrowitz Aff. ¶ 12.)

---

[1]      Where, as here, "'the court determines that defendant is in default, the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.'"  Chen v. Jenna Lane, Inc., 30 F. Supp. 2d 622, 623 (S.D.N.Y. 1998) (Carter, D.J. & Peck, M.J.) (quoting 10A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure: Civil 3d § 2688 at 58-59 (3d ed. 1998)).

3

**The Contract**

The parties' relationship is governed by their "Exclusive Distribution Agreement" and "Supplemental Agreement," both entered into on January 14, 2008 (collectively, the "Contract"). (Dkt. No. 1: Compl. Ex. A: Distrib. Contract; Compl. Ex. B: Contract Supp.)  The Contract appoints RGI as "the sole and exclusive distributor" of bottles of specific vodka brands, and gives RGI "the exclusive rights to market, sell, promote, distribute and/or service the Products to third parties located or headquartered in" the designated area, including the United States.  (Compl. Ex. A: Distrib. Contract ¶ 1.)  Under the Contract, RGI "agree[d] to actively promote and solicit sales" of the products, and CBA agreed to "make [its] best efforts to provide additional technical and promotional assistance and support as is reasonably required by [RGI], including product samples, English language technical information about Products, and other materials and information as may be reasonably required by [RGI] from time to time."  (Distrib. Contract ¶¶ 1, 2(a).)

The Contract requires CBA to "maintain at its expense sufficient inventory to maintain reasonable delivery times" to the United States, but also provides that RGI "shall make its best efforts to regularly inform [CBA] of its expected supply needs."  (Distrib. Contract ¶ 2(c).)  CBA warranted that "all Products are free of any defects," that CBA will address any defective product claims "fairly and promptly in good faith," and that it "will replace at its cost all defective Products within thirty (30) days" of the claim.  (Distrib. Contract ¶¶ 4(a)-(b).)  CBA "agree[d] to make [a] good-faith effort to acquire the appropriate quality of raw materials at the lowest price" to avoid upward price fluctuations from the base prices set forth in the Contract.  (Distrib. Contract ¶ 3(a).)

The Contract sets forth specific pricing and payment parameters:

4

(a) **Price.**  The purchase price to [RGI] for a 750ml bottle of "Dragon Bleu Vodka" shall be €3.70, as of December 7, 2007.  This price does not include [CBA's] profit, which will equal the greater of €1 or $1.50 USD.  Therefore, the total price to [RGI] for a 750ml bottle of "Dragon Bleu Vodka" shall equal the greater of €4.70 or the sum of €3.70 plus $1.50 USD.  Profit payment terms may be changed from time to time as required by [CBA] and may be modified by subsequent agreement.  The price of such bottle will fluctuate, up or down, depending on the wholesale price of raw materials used to manufacture said Products.  [CBA] agrees to make good-faith effort to acquire the appropriate quality of raw materials at the lowest price.

(b) **Payment.**  [RGI] shall remit payment to [CBA] for the products as follows.  (a) 50% of total payment amount shall be due at the time the order is placed; (b) 30% of total payment amount shall be due at the time the products are ready and [CBA] ships the products; and (c) 20% of total payment amount shall be due 30 days after the products are delivered to [RGI's] facility in the Territory.  All payments will be by wire transfer to [CBA's] designated account.

(Distrib. Contract ¶¶ 3(a)-(b); see also Compl. Ex. B: Contract Supp. ¶ 2.)

Additional terms in the Supplemental Agreement provide, inter alia, as follows:

1.     [RGI] agrees to advance payment in the amount of €85,000 to [CBA].  Such payment shall include: (a) €63,000 paid for 50,000 glass bottles, as well as corks, caps, and necessary boxes for all 50,000 bottles, and (b) €22,000 paid for the decoration and bottling of 20,000 bottles.

. . . .

3.     For the first order of 20,000 bottles from [CBA], 50% of the total payment amount, which is due at the time the order is placed, shall be deducted from the advance payment of €85,000.  Subsequently, for orders of the following 30,000 bottles only, 50% of the total payment amount, which is due at the time the order is placed, shall be calculated as follows: (a) for each order of 10,000 bottles, a sum of €12,500 will be deducted from the advance payment of €85,000; (b) the remaining €11,000 shall be paid by [RGI] at the time the order is placed.

(Contract Supp. ¶¶ 1, 3.)

The Contract has an initial seven-year term, but provides that at any time prior to its expiration, either party may terminate it "for good cause," such as if "the other party fails to remedy a material breach."  (Distrib. Contract ¶¶ 5(a)-(b).)

The Contract is governed by New York law, and further provides that "each party hereby consents to service of process and personal jurisdiction" in New York.  (Distrib. Contract ¶ 10.)

**Performance Under the Contract**

RGI placed its first order for products in May 2008; CBA shipped that product in Container 1 on or about August 5, 2008.  (Dkt. No. 1: Compl. ¶¶ 19-20.)  Upon receipt and inspection of the shipment, RGI discovered a portion of the products in Container 1 was defective, and notified CBA on or about August 29, 2008.  (Compl. ¶¶ 21-23.)  Pursuant to CBA's instructions, RGI shipped the non-duty-paid defective products back to France, and retained the duty-paid defective products in the United States where CBA would arrange for repair or replacement. (Compl. ¶¶ 24-26.)  CBA never repaired or replaced the duty-paid defective products.  (Compl. ¶ 27.)[2/]

In August 2010, RGI placed its fifth and sixth orders for products, for shipment in Containers 5 and 6.  (Compl. ¶¶ 28, 34-35.)  RGI's Container 5 order, which was scheduled to ship in time for the 2010 holiday season, included an order for 1.75 liter bottles (the "Futura Bottles"). (Compl. ¶¶ 29-30, 42.)  RGI paid the first 50% installment for Container 5 in August 2010, and the first 50% installment for Container 6 in September 2010.  (Compl. ¶¶ 34-35.)  After accepting the

---

[2/]     RGI's second, third and fourth orders were shipped, respectively, on or about August 23, 2008 (Container 2), February 10, 2009 (Container 3), and July 13, 2009 (Container 4).  (Dkt. No. 34: Rapp Aff. ¶ 10.)

first installments, CBA informed RGI that the orders would not be filled unless RGI paid the second 30% installment on Container 5—which, under the Contract's payment terms, was not due until the products were ready for shipment (Distrib. Contract ¶ 3(b))—in order to cover the costs of the raw materials needed to manufacture the products, including the Futura Bottles. (Compl. ¶¶ 30-32, 36-38, 40.) Because RGI had already accepted third-party orders that it would not be able to fill without the products in Containers 5 and 6, RGI acquiesced to CBA's demand and paid the second 30% installment on Container 5 in October 2010. (Compl. ¶¶ 33, 37, 39, 41.)[3/]

CBA failed to ship Container 5 in time for the 2010 holiday season as agreed; RGI received Container 5 on or about January 15, 2011. (Compl. ¶¶ 42-43.) At the United States arrival port, it was determined that the weight listed on Container 5's bill of lading exceeded the permissible weight for containers being transported on United States highways. (Compl. ¶¶ 52-53.) Container 5 had to be broken down into two different containers, causing RGI to incur further delays and expenses that CBA refused to reimburse. (Compl. ¶ 54.)

Upon receipt and inspection of Container 5, RGI determined that "some or all" of the products were defective, and so informed CBA on or about April 12, 2011. (Compl. ¶¶ 56-58.) CBA has not repaired or replaced the defective products in Container 5. (Compl. ¶¶ 59-60.)

---

[3/]    At some point before Container 5 was shipped, and in any event no later than November 8, 2010, CBA informed RGI (and RGI apparently accepted) that the Futura Bottles were underway but would not necessarily be delivered in Container 5 and may instead be delivered in Container 6. (Compl. ¶ 32; Rapp Aff. Ex. H-5: 11/8/10 Email at 2 ("So the 1,75L bottles will not be ready for container 5."); see also Rapp Aff. Ex. C-5: 9/6/10 Containers Breakdown (providing product and pricing information for "SCENARIO 1" in which the Futura Bottles would be shipped in Container 6, and "SCENARIO 2" in which they would be shipped in Container 5).)

7

CBA attempted to impose a unilateral price increase for the products to be shipped in Container 6, and demanded the second 30% installment on Container 6 before it would manufacture the products. (Compl. ¶¶ 44, 63.) RGI refused both demands and CBA has neither shipped Container 6 nor refunded RGI's first 50% installment paid on that order. (Compl. ¶¶ 45-46, 62, 64.) CBA refused to accept any additional orders from RGI unless they were prepaid in full, preventing RGI from filling and soliciting orders and from successfully promoting and marketing the products. (Compl. ¶¶ 50, 65-69, 72.)

Finally, RGI alleges that CBA overcharged RGI for products by either purchasing overpriced raw materials in violation of paragraph 3(a) of the Contract, or falsifying its actual costs for raw materials in order to reap higher profits than the contractual €1 allowance. (Compl. ¶¶ 73-74.)

**Inquest Submissions**

In support of RGI's request for inquest damages, RGI submitted a brief (Dkt. No. 35: RGI Br.), an attorney's affidavit (Dkt. No. 33: Paltrowitz Aff.), and an affidavit from RGI member Jared Rapp attaching hundreds of pages of documents purporting to support RGI's damages (Dkt. No. 34: Rapp Aff.).

RGI's six-page brief, which contains a short legal argument in favor of a default judgment, contains no argument and cites no authority for its entitlement to any of its claimed damage amounts. (See RGI Br. at 5-6: "Annexed to the [Rapp Affidavit] are 48 Exhibits and three 'zip files' containing numerous additional exhibits, which, taken together, should be sufficient for the Court to determine the monetary damages that have been sustained by RGI.")

The attorney affidavit attaches invoices and a wire transfer receipt showing the costs RGI incurred to effect service on CBA in France.  (Paltrowitz Aff. ¶¶ 2-3 & Ex. A: 5/31/12 Process Server Invoice & Wire Transfer; Paltrowitz Aff. Ex. B: 7/20/12 Attorney Invoice.)  The Paltrowitz Affidavit also explains the amounts being sought on each of RGI's causes of action.  (Paltrowitz Aff. ¶¶ 10-16.)

The Rapp Affidavit and its exhibits, which are intended to provide the Court with a basis for RGI's claimed damages, largely contain facts that only would be relevant to establishing liability—which is already established by virtue of the default (see page 10 below)—and conclusory statements of the resulting damages without explanations of the calculations or of how the supporting exhibits lend themselves to such calculations.  (See Rapp Aff. ¶¶ 12-31.)

CBA also filed an inquest submission (see page 2 above), consisting of an affidavit and supporting documents intended "to complete the information given by RGI."  (Dkt. No. 37: 2/25/13 Letter ("Aurige Aff.") & Exs. A-M.)

## ANALYSIS

## I.   DEFAULT JUDGMENT

### A.   A Default Judgment Should Be Entered Because CBA Cannot Appear In This Action Without Counsel

It is black letter law that corporations, partnerships, limited liability companies, associations, and all other artificial entities must be represented by counsel and may not appear pro se in federal court.  E.g., Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council, 506 U.S. 194, 201-02, 113 S. Ct. 716, 721 (1993) ("It has been the law for the better part of two centuries, for example, that a corporation may appear in the federal courts only through licensed counsel."); United States v. Twenty Miljam-350 IED Jammers, 669 F.3d 78, 91 (2d Cir. 2011); Lawrence v.

U.S. S.E.C., 384 F. App'x 44, 45 (2d Cir. 2010); Lattanzio v. COMTA, 481 F.3d 137, 140 (2d Cir. 2007) (A "limited liability company also may appear in federal court only through a licensed attorney."); Grace v. Bank Leumi Trust Co. of N.Y., 443 F.3d 180, 192 (2d Cir. 2006), cert. denied, 549 U.S. 114, 127 S. Ct. 962 (2007); Eagle Assocs. v. Bank of Montreal, 926 F.2d 1305, 1310 (2d Cir. 1991); All-Star Mktg. Grp., LLC v. Media Brands Co., 775 F. Supp. 2d 613, 618 & n.1 (S.D.N.Y. 2011) (Peck, M.J.) (collecting cases).[4]

   A default judgment is appropriately entered where a corporate defendant "has failed to . . . otherwise defend" an action by disregarding a court order to appear through counsel.  Fed. R. Civ. P. 55(a); City of N.Y. v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 129-30 (2d Cir. 2011); Grace v. Bank Leumi Trust Co. of N.Y., 443 F.3d at 192; Eagle Assocs. v. Bank of Montreal, 926 F.2d at 1310.[5]

---

[4]   See also, e.g., S & S Mach. Corp. v. Wuhan Heavy Duty Mach. Tool Grp. Co., No. 07-CV-4909, 2012 WL 958527 at *3 (E.D.N.Y. Mar. 21, 2012); Balestriere PLLC v. CMA Trading, Inc., 11 Civ. 9459, 2012 WL 695401 at *2 (S.D.N.Y. Mar. 5, 2012).

[5]   See also, e.g., Premier Fla. Auto Sales & Leasing v. Mercedes-Benz of Massapequa, LLP, No. CV 10-4428, 2012 WL 7149418 at *2 (E.D.N.Y. Nov. 5, 2012) ("A failure by a corporate defendant to obtain counsel constitutes a failure to defend because a corporation cannot proceed pro se."), report & rec. adopted, 2013 WL 593506 (E.D.N.Y. Feb. 14, 2013); S & S Mach. Corp. v. Wuhan Heavy Duty Mach. Tool Grp. Co., 2012 WL 958527 at *3; Balestriere PLLC v. CMA Trading, Inc., 2012 WL 695401 at *2 ("A default is warranted if a defendant cannot proceed without counsel and either will not or cannot obtain an attorney. Failure by such a party to obtain counsel after being warned of the necessity to do so justifies entry of a default or dismissal." (citation omitted)); Next Proteins, Inc. v. Distinct Beverages, Inc., No. 09 CV 4534, 2012 WL 314871 at *1 (E.D.N.Y. Feb. 1, 2012); Semi Conductor Materials, Inc. v. Agric. Inputs Corp., 96 Civ. 7902, 1998 WL 388503 at *5 (S.D.N.Y. June 23, 1998) (Kaplan, D.J. & Peck, M.J.) (Plaintiff "has failed to comply with . . . [the Court's] Orders . . . that [plaintiff] participate in this action through a member of the Bar of this Court.  [Plaintiff's] failure to appear by counsel would be sufficient by itself to grant a default judgment.").

CBA is a French entity comparable to an American limited liability company, and thus it may appear in this action only through licensed counsel.  (Dkt. No. 1: Compl. ¶ 2 n.1.)[6/]  CBA has been twice advised by this Court of the need to retain counsel.  (Dkt. No. 27: 1/29/13 Order ("A corporation cannot appear pro se but must be represented by counsel."); Dkt. No. 38: 3/4/13 Order ("Defendant cannot appear except through counsel.").)  Having nevertheless failed to retain counsel, CBA is in default, and RGI's motion for entry of a default judgment therefore should be granted. See, e.g., Eagle Assocs. v. Bank of Montreal, 926 F.2d at 1310.

**B.     CBA's Counterclaims Also Should Be Dismissed**

"In entering default judgment against a corporate defendant for failing to appear by counsel, it is also appropriate for a court to strike the answer and counterclaims of that defendant." Next Proteins, Inc. v. Distinct Beverages, Inc., No. 09 CV 4534, 2012 WL 314871 at *2 (E.D.N.Y. Feb. 1, 2012); accord, e.g., Eagle Assocs. v. Bank of Montreal, 926 F.2d 1305, 1306 (2d Cir. 1991) (affirming district court's entry of default judgment and dismissal of counterclaims and cross-claims based on appellant's "failure to appear through counsel as ordered by the district court").

CBA asserted four counterclaims against RGI in this action.  (Dkt. No. 14: Ans. & Counterclaims ¶¶ 26-52.)  Because a default judgment should be entered against CBA, CBA's counterclaims also should be dismissed with prejudice.  See, e.g., Christa Constr., LLC v. Connelly

---

[6/]     "'SARL is the French abbreviation for a term used to describe a private company similar to an American limited liability company.'" V & M Star, LP v. Centimark Corp., 596 F.3d 354, 356 (6th Cir. 2010); see also, e.g., Exim, Inc. v. Innogarant, LLC, 10 Civ. 5271, 2011 WL 240130 at *3 (S.D.N.Y. Jan. 19, 2011) ("No corporation or other business entity can appear in an action in this court except through counsel.  [Defendant] was advised many months ago . . . that it needed to hire an attorney to represent it in this action; it has elected not to do so. . . . [Defendant] is in default and it has failed to cure its default.  Although [defendant] is a Russian corporation, there is no inequity in requiring it to conform to the rules." (citation omitted)).

Drywall, LLC, 879 F. Supp. 2d 389, 392-93 (W.D.N.Y. 2012) ("Given [defendant's] failure to 'otherwise defend' by its refusal to obtain new counsel, the plaintiff's motion for default judgment is granted. . . . [Defendant's] counterclaims are dismissed with prejudice."); Next Proteins, Inc. v. Distinct Beverages, Inc., 2012 WL 314871 at *3 ("[A]s a default judgment has been entered against [defendant] for its failure to appear by counsel, its answer and counterclaim are also stricken . . . ."); Team Air Express, Inc. v. A. Heffco Techs., Inc., No. 06 CV 2742, 2008 WL 4790469 at *2 (E.D.N.Y. Jan. 7, 2008) ("Given defendant's failure to obtain new counsel within the time ordered by the Court and the inability of a corporation to proceed pro se in federal court, the Court respectfully recommends that plaintiff's motion for default and to strike the Answer and Counterclaim be granted.").[7]

## II.   **INQUEST DAMAGES**[8]

RGI seeks damages for breach of contract in the amount of $944,937,[9] plus interest

---

[7]   See also, e.g., Kiewit Constructors, Inc. v. Franbuilt, Inc., No. 07-CV-121A, 2007 WL 4405029 at *2 (W.D.N.Y. Dec. 14, 2007) (Defendant "has failed to comply with my order directing it to appear by counsel. Consequently, . . . I recommend that [defendant's] counterclaims against [plaintiff] be dismissed."); Int'l Brands USA, Inc. v. Old St. Andrews Ltd., 349 F. Supp. 2d 256, 264 (D. Conn. 2004); CMI Capital Corp. v. DHKT Inv. Co., No. 99-CV-4338, 2002 WL 460040 at *2 (E.D.N.Y. Feb. 9, 2002); Warner v. Foremost Designers Ltd., 00 Civ. 5466, 2001 WL 1020900 at *1 (S.D.N.Y. Aug. 31, 2001).

[8]   The Second Circuit has approved the holding of an inquest by affidavit, without an in-person court hearing, "'as long as [the Court has] ensured that there was a basis for the damages specified in the default judgment.'" Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997) (quoting Fustok v. ContiCommodity Servs., Inc., 873 F.2d 38, 40 (2d Cir. 1989)).

[9]   RGI's inquest submissions state the total requested amount is $954,937. (Dkt. No 33: Paltrowitz Aff. ¶ 17(III); Dkt. No. 34: Rapp Aff. p. 9 ¶ III.)   After reviewing RGI's submissions, the Court concluded that the total amount RGI actually seeks is $944,937; the $10,000 difference is likely the result of either a typo or an arithmetic error. (See Rapp Aff.
(continued...)

and costs.  (Paltrowitz Aff. ¶¶ 17(II)-(IV); Rapp Aff. p. 9 ¶¶ II-IV.)[10/]

---

[9/]    (...continued)
    ¶ 24 (seeking $151,589); Rapp Aff. ¶ 25 (seeking $55,000); Rapp Aff. ¶ 30 (seeking $600,000); Rapp Aff. ¶ 31 (seeking $138,348).)

[10/]    Because the damages on RGI's breach of contract claim encompass all of the damages RGI purports to seek under the other legal theories advanced in its Complaint, only the breach of contract cause of action is a properly pleaded claim for damages.  That is, RGI's second cause of action for anticipatory breach (Dkt. No. 1: Compl. ¶¶ 79-82) seeks the same lost future profits that RGI would recover on its breach of contract claim; it is not a distinct cause of action. (Paltrowitz Aff. ¶¶ 10-11.)  See, e.g., Verus Pharms., Inc. v. AstraZeneca AB, 09 Civ. 5660, 2010 WL 3238965 at *12 (S.D.N.Y. Aug. 16, 2010) ("[A]nticipatory breach or repudiation simply means that 'the promisee gets to choose whether the breach occurs at the time of the anticipatory repudiation, or at the time for performance.'  As [plaintiff] determined that, in its view, the Agreements had already been breached and as [plaintiff] has brought this action for breach of contract, it cannot simultaneously pursue a claim for anticipatory breach." (citations omitted)), aff'd, 427 F. App'x 49 (2d Cir. 2011); Lucente v. Int'l Bus. Machs. Corp., 146 F. Supp. 2d 298, 309 n.5 (S.D.N.Y. 2001) ("Technically speaking, there is no cause of action for 'anticipatory breach of contract.'  There is only a claim for breach of contract."), rev'd on other grounds, 310 F.3d 243 (2d Cir. 2002).  The same is true for RGI's third and fourth causes of action for lost sales and damage to business reputation (Compl. ¶¶ 83-90), as RGI concedes.  (Paltrowitz Aff. ¶¶ 11-12 (lost sales damages in third cause of action are same as anticipatory breach, i.e., breach of contract, damages); Paltrowitz Aff. ¶ 13 ("RGI does not seek damages with regard to the fourth cause of action separate from the damages sought in connection with the second and third causes of action.").)  The damages sought in connection with the fifth cause of action for fraud (Compl. ¶¶ 91-93) are based on the same Futura Bottles purchase price claimed as breach of contract damages.  (Paltrowitz Aff. ¶ 14; Rapp Aff. ¶ 24.)  Likewise, the alleged raw materials overpayment amount sought on the sixth cause of action (Compl. ¶¶ 94-96) is included in the breach of contract damages.  (Paltrowitz Aff. ¶¶ 10, 15.)  Thus, there are no damages claimed on any of these causes of action that would be separately recoverable.  See, e.g., Billion Tower Int'l, LLC v. MDCT Corp., 08 Civ. 4185, 2010 WL 5536513 at *4 n.3 (S.D.N.Y. Dec. 10, 2010) ("In any event, '[a] plaintiff seeking compensation for the same injury under different legal theories is of course only entitled to one recovery.'" (quoting Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 497 (2d Cir. 1995))), report & rec. adopted, 2011 WL 43458 (S.D.N.Y. Jan. 6, 2011); Homkow v. Musika Records, Inc., 04 Civ. 3587, 2009 WL 721732 at *17 (S.D.N.Y. Mar. 18, 2009) ("[T]he damages Plaintiff seeks on this claim are redundant of the breach of contract damages discussed earlier.  Accordingly, the Court recommends that there be no award of damages for the alleged" redundant claim.).

A.    **Legal Standards**

1.    **Damages Must Be Proved On An Inquest**

"[I]t is well established that '[w]hile a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages.'" Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Annuity Fund, Educ. & Training Fund & Other Funds v. Metro Found. Contractors Inc., 699 F.3d 230, 234 (2d Cir. 2012) (quoting Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992), cert. denied, 506 U.S. 1080, 113 S. Ct. 1049 (1993)).[11/]

On an inquest for damages following a default, plaintiff bears the burden of proof and must introduce sufficient evidence to establish the amount of damages with reasonable certainty. See, e.g., Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d at 158; Billion Tower Int'l, LLC v. MDCT Corp., 08 Civ. 4185, 2010 WL 5536513 at *3 (S.D.N.Y. Dec. 10, 2010) (Plaintiff "bears the burden of establishing its entitlement to recovery and thus must substantiate its claim with evidence to prove the extent of its damages."), report & rec. adopted, 2011 WL 43458 (S.D.N.Y. Jan. 6, 2011); Nwagboli v. Teamwork Transp. Corp., 08 Civ. 4562, 2009 WL 4797777 at *2 (S.D.N.Y. Dec. 7, 2009) ("[T]he amount of damages awarded, if any, must be ascertained 'with reasonable certainty.'").[12/]

---

[11/]    Accord, e.g., Homkow v. Musika Records, Inc., 04 Civ. 3587, 2009 WL 721732 at *5 (S.D.N.Y. Mar. 18, 2009) ("A default judgment that is entered on the well-pleaded allegations in a complaint establishes a defendant's liability, and the sole issue that remains before the court is whether the plaintiff has provided adequate support for the relief it seeks." (citations omitted)).

[12/]    See also, e.g., Lenard v. Design Studio, 889 F. Supp. 2d 518, 527 (S.D.N.Y. 2012) ("A plaintiff must therefore substantiate a claim with evidence to prove the extent of damages.");
(continued...)

A plaintiff's statement as to the amount of damages alone does not provide the requisite reasonable certainty.  See, e.g., House v. Kent Worldwide Mach. Works, Inc., 359 F. App'x 206, 207 (2d Cir. 2010) ("[T]he district court cannot simply rely on the plaintiff's statement of damages; there must be a basis upon which the court may establish damages with reasonable certainty."); Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997) ("[T]he District Court . . . could not just accept [plaintiff's] statement of the damages. This did not satisfy the court's obligation to ensure that the damages were appropriate."); Agbaje v. Bah, 09 Civ. 6201, 2010 WL 6370541 at *3 (S.D.N.Y. Dec. 23, 2010) ("The Court cannot simply accept [plaintiff's] statement of damages, but must 'determine the damages based on appropriate evidence.'" (quoting Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d at 111)), report & rec. adopted, 2011 WL 1197641 (S.D.N.Y. Mar. 25, 2011).[13]

"Where, on a damages inquest, a plaintiff fails to demonstrate its damages to a

---

[12]  (...continued)
TMS Entm't Ltd. v. Madison Green Entm't Sales, Inc., 03 Civ. 0517, 2005 WL 2063786 at *2 (S.D.N.Y. Aug. 16, 2005) ("The Court must . . . determine the amount of damages with reasonable certainty . . . ."); Int'l Telecom, Inc. v. Generadora Electrica del Oriente, S.A., 00 Civ. 8695, 2004 WL 784941 at *2 (S.D.N.Y. Apr. 13, 2004).

[13]  See also, e.g., ACCD Global Agric. Inc. v. Perry, 12 Civ. 6286, 2013 WL 840706 at *1 (S.D.N.Y. Mar. 1, 2013) ("Such damages require, however, more than the mere assurance from the entity itself that the profits were realizable and realistic—more than the mere ipsidixit of 'I say I can make that money, therefore I can'—and instead require plaintiffs to eventually establish both the existence and amount of the profits allegedly lost to a reasonable certainty."); Billion Tower Int'l, LLC v. MDCT Corp., 2010 WL 5536513 at *9 ("The Second Circuit has made clear that a court 'may not just accept [a party's] statement of the damages.'"); Mason Tenders Dist. Council Welfare Fund v. I.M.I. Constr. Corp., 99 Civ. 12105, 2004 WL 1700615 at *1 (S.D.N.Y. July 30, 2004) (Peck, M.J.) (rejecting plaintiffs' proposed damages where, "other than an ipse dixit in an affidavit reciting those amounts, they do not provide any evidence as to how those amounts were arrived at").

reasonable certainty, the court should decline to award any damages, even though liability has been established through default." Lenard v. Design Studio, 889 F. Supp. 2d at 527; accord, e.g., Ainbinder v. Bernice Mining & Contracting Inc., 01 Civ. 2492, 2002 WL 461576 at *4 (S.D.N.Y. Mar. 26, 2002) (Peck, M.J.) ("Absent proof of damages on an inquest, the Court cannot award damages.").

### 2. Applicable Breach Of Contract Damages Standards

"Damages for breach of contract are determined by calculating the 'amount necessary to put the plaintiff in the same economic position he would have been in had the defendant fulfilled his contract.'" Agbaje v. Bah, 09 Civ. 6201, 2010 WL 6370541 at *3 (S.D.N.Y. Dec. 23, 2010) (quoting Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 495 (2d Cir. 1995)), report & rec. adopted, 2011 WL 1197641 (S.D.N.Y. Mar. 25, 2011).[14/] "An alternative measure of damages allows a plaintiff to recover his expenses of preparation and of part performance, as well as other foreseeable expenses incurred in reliance upon the contract." Agbaje v. Bah, 2010 WL 6370541 at *3 (quotations omitted); accord, e.g., Bausch & Lomb Inc. v. Bressler, 977 F.2d 720, 729 (2d Cir. 1992); Nwagboli v. Teamwork Transp. Corp., 2009 WL 4797777 at *3. "Under either measure, [t]he court must be able to ascertain the amount of damages with reasonable certainty." Agbaje v. Bah, 2010 WL 6370541 at *3 (quotations omitted); accord, e.g., Bausch & Lomb Inc. v. Bressler, 977 F.2d at 731 ("A plaintiff seeking damages for breach of contract may not recover 'for loss

---

[14/] Accord, e.g., Lucente v. IBM Corp., 310 F.3d 243, 262 (2d Cir. 2002); Nwagboli v. Teamwork Transp. Corp., 08 Civ. 4562, 2009 WL 4797777 at *3 (S.D.N.Y. Dec. 7, 2009) ("As a general rule, 'damages for breach of contract should put the plaintiff in the same economic position he would have been in had the defendant fulfilled the contract.'"); 11 Corbin on Contracts § 55.3 (2012); 24 Williston on Contracts §§ 64:1-64:2 (4th ed. 2012).

beyond an amount that the evidence permits to be established with reasonable certainty.'" (quoting Restatement (Second) of Contracts § 352 (1979))).

Generally under New York law, the nonbreaching party may recover "'general,' consequential contract damages which are the natural and probable consequence of the breach." Reads Co. v. Katz, 72 A.D.3d 1054, 1056, 900 N.Y.S.2d 131, 133 (2d Dep't 2010).[15/]  To collect "'special' or extraordinary [consequential] damages that do not flow directly from the breach, however, a plaintiff is required to [show] that the damages were foreseeable and within the contemplation of the parties at the time the contract was made." Reads Co. v. Katz, 72 A.D.3d at 1056, 900 N.Y.S.2d at 134.[16/]  "A plaintiff is seeking general damages when he tries to recover 'the value of the very performance promised.'" Schonfeld v. Hilliard, 218 F.3d 164, 175 (2d Cir. 2000); 9 Murray on Contracts § 120[B] (2001).  "'Special' or 'consequential' damages, on the other hand, seek to compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach." Schonfeld v. Hilliard, 218 F.3d at 176.

### B.   RGI Should Be Awarded $57,940 In Breach Of Contract Damages

RGI seeks an award of $944,937.03 based on the following categories of alleged

---

[15/]   See, e.g., Mestousis Enters. Inc. v. Concord Blue Inc., 11 Civ. 3384, 2012 WL 254987 at *3 (S.D.N.Y. Jan. 27, 2012) (Peck, M.J.), report & rec. adopted, 2012 WL 1193752 (S.D.N.Y. Apr. 10, 2012); Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams., 618 F. Supp. 2d 280, 292 (S.D.N.Y. 2009); Command Cinema Corp. v. VCA Labs, Inc., 464 F. Supp. 2d 191, 200 (S.D.N.Y. 2006); 11 Corbin on Contracts § 56.6 (2012).

[16/]   See, e.g., Mestousis Enters. Inc. v. Concord Blue Inc., 2012 WL 254987 at *3; Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams., 618 F. Supp. 2d at 292;  Command Cinema Corp. v. VCA Labs, Inc., 464 F. Supp. 2d at 200.

damages: (1) $29,177 stemming from the Container 1 shipment; (2) $43,058 stemming from the Container 5 order and shipment; (3) $37,779.99 stemming from the Container 6 order; (4) $9,892.83 stemming from the order for Futura Bottles; (5) $31,681.07 in advanced payment balances; (6) $600,000 in lost profits; (7) $55,000 in promotional and marketing expenses; and (8) $138,348 stemming from overcharges for the purchase of raw materials.  (Dkt. No. 34: Rapp Aff. ¶¶ 24-25, 29-31.)  For the reasons set forth below, RGI should be awarded only **$57,940** in damages.

### 1.    **Container 1**

RGI seeks $29,177 "for the defective Products and out-of-pocket warehousing expenses directly attributable to these Products" shipped in Container 1.  (Dkt. No. 34: Rapp Aff. ¶ 14; Dkt. No. 1: Compl. ¶¶ 20-27.)  RGI provides no description of how this figure was calculated, instead relying exclusively on two wire transfer receipts, three emails and a memorandum between RGI and CBA discussing, inter alia, the defective products in Container 1.  (Rapp Aff. ¶¶ 12-14, 24; Rapp Aff. Ex. E-1: 8/21/08 & 8/25/08 Emails; Rapp Aff. Ex. E-2: 8/30/08 & 9/1/08 Emails; Rapp Aff. Ex. E-3: 9/1/11 Email; Rapp Aff. Ex. F: 4/19/11 Memo at 7-8; Rapp Aff. Ex. G-1: 6/9/08 Wire Transfer; Rapp Aff. Ex. G-2: 1/30/08 Wire Transfer.)  This evidence does not substantiate RGI's claimed $29,177 damages amount.

First, as to the "out-of-pocket warehousing expenses" or any other incidental costs that might have been included in RGI's unexplained calculation of damages from the Container 1 shipment, RGI fails to submit a single piece of evidence reflecting any such expenses.

Second, other than a bald assertion "that some of the Products in Container 1, having a value of $28,800.00, were defective," RGI does not point to any evidence to substantiate the value of the defective products.  (Rapp Aff. ¶ 12.)  Rather, RGI cites two wire transfer receipts as "proofs

of payment for the defective Products" in Container 1.  (Rapp Aff. ¶ 14.)  At most, however, these receipts are proof that RGI paid the first two installments of the total price for Container 1.  (Rapp Aff. Ex. G-2: 1/30/08 Wire Transfer; see Compl. Ex. B:  Contract Supp. ¶ 3.)[17]  Since RGI alleges there were defects in only "some of the Products in Container 1," proof of RGI's payment for the full shipment does not provide support for a determination of the value of the defective portion.

The emails and memo RGI submits are similarly devoid of evidence proving the amount of damages, and instead prove only that RGI notified CBA of the defective products in August 2008, and that some portion of this claim remains unresolved.  While these documents certainly show that RGI was damaged by CBA's failure to repair or replace the defective products that RGI paid for, RGI does not explain how these documents substantiate the $29,177 damages calculation.  See, e.g., Ainbinder v. Bernice Mining & Contracting Inc., 01 Civ. 2492, 2002 WL 461576 at *4 (S.D.N.Y. Mar. 26, 2002) (Peck, M.J.) ("There is no doubt that, in this mining deal, plaintiffs got the shaft.  While the Court assumes that plaintiffs have been damaged by [defendant's]

---

[17]    The January 30, 2008 wire transfer appears to be RGI's initial €85,000 investment, from which the first 50% payment due on Container 1 would have been deducted.  (Rapp Aff. Ex. G-2: 1/30/08 Wire Transfer; Contract Supp. ¶¶ 1-3.)  RGI may have intended the June 9, 2008 wire transfer to show proof of its second 30% payment due on Container 1, but this is unexplained, and the information on the receipt does not on its face support that conclusion.  (Rapp Aff. Ex. G-1: 6/9/08 Wire Transfer.)  For example, the transfer amount of $44,000 is much more than the USD equivalent of the second 30% installment of €21,150 reflected on the Container 1 invoice.  (Rapp Aff. Ex. C-2: 8/23/08 Container 1 Invoice.)  The June 9, 2008 receipt also shows that the wire transfer was sent to a James Seivright in an account ending in 9988 (Rapp Aff. Ex. G-2: 6/9/08 Wire Transfer), whereas the January 31, 2008 receipt clearly indicates that the transfer was sent to CBA ("Payee Name Cognac Brisset - Aurige") in an account ending in 6273 64 (Rapp Aff. Ex. G-1: 1/30/08 Wire Transfer), which is the account number reflected in the Contract (Contract Supp. ¶ 4).

breach of the January 1997 agreement, plaintiffs have not proved the amount of any such damages. Absent proof of damages on an inquest, the Court cannot award damages.").

Nevertheless, the Court has carefully examined all of RGI's submissions in an attempt to find some evidentiary basis for determining a reasonably certain amount, such that a damages award can be made. As set forth below, the Court finds that RGI's evidentiary proffer establishes with reasonable certainty that RGI suffered $20,161 in damages from the defective products in Container 1.

Pursuant to CBA's instruction, RGI shipped the non-duty-paid portion of the defective products back to CBA, retaining the duty-paid portion to be repaired by CBA in the United States. (Compl. ¶¶ 24-26; Rapp Aff. ¶ 13.) It appears that the non-duty-paid defective products RGI shipped back to CBA were replaced with other bottles in February 2009.[18/] (Rapp Aff. Ex. F: 4/19/11 Memo ¶ 6 ("those 4 pallets were replaced and were compensated in the free 1 liter bottles deal, delivered in 2009"); Rapp Aff. Ex. C-3: 2/1/09 Container 3 Invoice (reflecting price as "offered" on shipment of one liter bottles).) The duty-paid portion of Container 1's defective products, however, was never repaired or replaced. (Compl. ¶ 27; Rapp Aff. Ex. E-3: 9/1/11 Email ("We have now reached the three-year anniversary of our continued possession of these defective bottles and this must be resolved with haste.").)

---

[18/]   Indeed, the Complaint alleges only that CBA failed to repair "the defective duty-paid Products in Container 1," i.e., the products RGI retained in the United States, but makes no allegation that CBA failed to replace the non-duty-paid products shipped back to France. (Compl. ¶ 27.)  This reading of the facts is consistent with a document submitted by CBA memorializing the parties' settlement of the Container 1 claims. (Dkt. No. 37: Aurige Aff. Ex. A: 3/11/09 Agreement.)

Thus, by searching RGI's submissions for evidence of the quantity of duty-paid defective products remaining unremedied (2,880 bottles, size 750 mL),[19] and multiplying that by the €4.70 Contract price per bottle RGI would have paid for the 750 milliliter bottles in Container 1 (Compl. Ex. A: Distrib. Contract ¶ 3(a)), the Court has determined with reasonable certainty that RGI is entitled to €13,536, or **$20,161**,[20] representing the value of the unrepaired and unreplaced duty-paid defective products from Container 1.[21]

## 2.   **Container 5**

In connection with Container 5, RGI seeks: (a) $18,816 for defective goods; (b) $5,627 for overweight expenses; and (c) $18,615 for a foregone discount on Container 6.  (Dkt. No. 34: Rapp Aff. ¶¶ 17, 24 & n.3.)

### a.   **Defective Goods**

---

[19]   The Court finds evidence to support that there are at least four defective pallets containing 750 milliliter size bottles remaining.  (Rapp Aff. Ex. F: 4/19/11 Memo ¶ 6: "AURIGE commits to travel to Michigan to rebottle the 4 defective pallets or will send 4 free pallets of 750 ml in the next container.")  Elsewhere in the submissions, the Court found evidence showing that a pallet of 750 milliliter bottles contains 720 bottles.  (See Rapp Aff. Ex. D-2: 1/7/11 Container 6 Order Form; Rapp Aff. Ex. K-2: 8/15/10 Container 5 Order Form.)

[20]   In converting the amount to USD, the Court utilized the 1.4895 exchange rate that was in effect on January 30, 2008, the date on which RGI made its 50% installment payment (Rapp Aff. Ex. G-2: 1/30/08 Wire Transfer: "Exchange Rate 1.4895")—the largest of the Container 1 payments (Distrib. Contract ¶ 3(b); Contract Supp. ¶¶ 1-3).

[21]   See, e.g., Int'l Brands USA, Inc. v. Old St. Andrews Ltd., 349 F. Supp. 2d 256, 263 (D. Conn. 2004) (damages "for defective and unmerchantable goods" determined by reference to invoices for the goods); see also, e.g., Bausch & Lomb Inc. v. Bressler, 977 F.2d 720, 730 (2d Cir. 1992) ("[I]n the absence of a readily available market price, the value that the parties ascribed to a benefit in their contract may be the best valuation measure available to the court."); 24 Williston on Contracts § 64:2 (4th ed. 2012) ("[T]he best measure of the value of the broken promise is the value assigned to it by the parties themselves.").

        In support of its claim for damages pertaining to Container 5's defective goods, RGI submitted two documents, which reflect that RGI notified CBA of the defects identified in the Container 5 shipment, but contain no information regarding the value of the defective products. (See Dkt. No. 34: Rapp Aff. ¶ 22; Rapp Aff. Ex. N-1: 8/30/11 Email; Rapp Aff. Ex. N-2: 8/30/11 Email.)  RGI provides no explanation or clear basis for its claimed $18,816 damages calculation. RGI's evidentiary proffer does not establish that RGI suffered $18,816 in damages from the defective products in Container 5, nor do they demonstrate that some other reasonably certain sum should be awarded.  Unlike with Container 1, the Court was unable to find any evidence as to the quantity of defective products in Container 5, and thus it cannot compute the purchase price of those products to determine a reasonably certain damages amount.  Consequently, RGI should not be awarded any damages on this claim.  See, e.g., Lenard v. Design Studio, 889 F. Supp. 2d 518, 526, 538 (S.D.N.Y. 2012) ("Plaintiff's submission . . . contains minimal, if any, explanation for the documentary evidence attached as exhibits, and, as discussed below, much of that evidence is sparse, is not self-explanatory, and does not appear to support the claimed damages figures. . . . Plaintiff has neither provided an adequate basis for the calculation of her contract damages nor provided an explanation, by anyone with personal knowledge, of the meager documentary evidence that she has submitted in support of her application for such damages.  Under the circumstances, this Court finds that Plaintiff has not satisfied her burden of demonstrating her contract damages to a reasonable certainty, and has therefore not demonstrated her entitlement to any damages, on this inquest."); Agbaje v. Bah, 09 Civ. 6201, 2010 WL 6370541 at *4 (S.D.N.Y. Dec. 23, 2010) ("[T]he purchase price [plaintiff] paid for the [product] is an inadequate measure of [plaintiff's] damages, and the Court cannot determine with reasonable certainty the [product's] value when it was consigned based

on the submitted evidence.  Therefore, the Court recommends that the [plaintiff] be awarded no damages for the loss of the" product.), report & rec. adopted, 2011 WL 1197641 (S.D.N.Y. Mar. 25, 2011); Mason Tenders Dist. Council Welfare Fund v. I.M.I. Constr. Corp., 99 Civ. 12105, 2004 WL 1700615 at *1, *2 n.4 (S.D.N.Y. July 30, 2004) (Peck, M.J.) ("Plaintiffs also seek $34,372.85 for unremitted dues checkoffs, and $3,338.52 for unremitted NY[L]PAC contributions, but other than an ipse dixit in an affidavit reciting those amounts, they do not provide any evidence as to how those amounts were arrived at. . . . Plaintiffs have offered no admissible proof of the amount sought for dues checkoff or for NYLPAC amounts, and thus nothing should be awarded for that . . . ." (citations omitted)).

### b.   Overweight Shipment Costs

RGI claims it is entitled to reimbursement for expenses it incurred as a result of Container 5's noncompliance with trans-shipment highway weight regulations.  (Dkt. No. 1: Compl. ¶¶ 52-55; Dkt. No. 34: Rapp Aff. ¶ 21.)  According to RGI, "[a]s a result of Container 5 being heavier than the permissible weight, Container 5 could not be removed from the port unless and until it was broken down into two containers, at a cost to RGI of a four week delay in receipt and $5,627.00 in additional expense."  (Rapp Aff. ¶ 21.)  RGI further alleges that CBA refused RGI's requests for reimbursement.  (Rapp Aff. ¶ 21; see also Compl. ¶ 55.)

RGI fails to address why these expenses (which do not appear to be consequences of any alleged breaches) would be recoverable.[22]  Moreover, RGI's evidence fails to provide any support for the claimed amount.

To support its $5,627 calculation, RGI submits the following: (i) two February 2011 emails (Rapp Aff. Ex. M: 2/10/11 Rapp Email & Ex. M-3: 2/28/11 Rapp Email); (ii) five invoices from AMC Logistics Worldwide, two dated May 27, 2011 (Rapp Aff. Ex. M-2: 5/27/11 $1,380 Invoice & Ex. M-2A: 5/27/11 $887 Invoice), one dated January 19, 2011 (Rapp Aff. Ex. M-1: 1/19/11 Invoice), one dated January 24, 2011 (Rapp Aff. Ex. M-1A: 1/24/11 Invoice), and, curiously, one dated December 2, 2008 (Rapp Aff. Ex. M-4: 12/2/08 Shipping Confirmation); (iii) transport documents including a January 17, 2011 Commercial Accompaniment Document, as well as a Maersk Line Waybill and an AMC Bill of Lading, both dated January 19, 2011 (Rapp Aff. Ex. M-4a at 3-5: Transport Documents); and (iv) a February 9, 2011 Maersk Line Status Notification (Rapp Aff. Ex. M-4a at 1-2: 2/9/11 Status Notification).

Of the documents submitted, only the AMC invoices contain dollar amounts, and RGI makes no attempt to explain how it reached the $5,627 requested amount based on the amounts in these invoices or otherwise.  Moreover, RGI specifically alleges the weight violation was discovered upon Container 5's arrival in New Jersey on or about January 30, 2011.  (Compl. ¶ 52;

---

[22]  The Court finds nothing in the record indicating that Container 5 was overweight because of CBA's delayed shipment or any other alleged breaches.  Nor does RGI point to any Contract provision requiring CBA to assume shipping costs of this type, such that CBA's failure to reimburse RGI would in and of itself constitute a breach.

Rapp Aff. ¶ 21.)[23]  Consequently, the three AMC invoices that predate Container 5's arrival could not possibly reflect expenses incurred as a result of the weight violation.  (Rapp Aff. Ex. M-1: 1/19/11 Invoice; Rapp Aff. Ex. M-1A: 1/24/11 Invoice; Rapp Aff. Ex. M-4: 12/2/08 Shipping Confirmation.)[24]  Accordingly, only the two May 27, 2011 invoices (totaling $2,267), could even theoretically reflect the alleged additional expenses RGI refers to in this claim, but RGI again makes no attempt to explain or describe any of the charges described in those invoices.  (Rapp Aff. Ex. M-2 & Ex. M-2A: 5/27/11 Invoices.)

Accordingly, RGI should not be awarded damages for the expenses it incurred from Container 5's alleged noncompliance with the weight requirements.  See, e.g., Lenard v. Design Studio, 889 F. Supp. 2d 518, 535 (S.D.N.Y. 2012) ("This account statement, however, merely shows a 'previous balance' . . . and certain charges related to taxes and utilities.  The document provides no details regarding the source of this previous balance, and makes no mention of any fine or violation.  As such, it is patently insufficient to support Plaintiff's damages claim. . . . In the absence of any documented—and explained—support for the nature and amount of any fines levied on and paid by Plaintiff, I recommend that her request for reimbursement for the payment of fines be denied." (record citation omitted)).

---

[23]  RGI alleges Container 5 was shipped on or about January 15, 2011, but fails to state when the shipment arrived.  (Compl. ¶ 43; Rapp Aff. ¶ 19.)  The invoices and transport documents submitted in connection with this claim, however, indicate an estimated arrival on or about January 30, 2011.  (Rapp Aff. Ex. M-4a at 1: 2/9/11 Status Notification; Rapp Aff. Ex. M-2: 5/27/11 $1,380 Invoice; Rapp Aff. Ex. M-2A: 5/27/11 $887 Invoice; see also Rapp Aff. Ex. M-1: 1/19/11 Invoice; Rapp Aff. Ex. M-1A: 1/24/11 Invoice.)

[24]  Of course, the December 2, 2008 Shipping Confirmation is utterly irrelevant; the shipment in Container 5 was not even ordered until August 2010.  (Compl. ¶¶ 28, 34.)

    c.        **Foregone Discount On Container 6 Order**

RGI alleges it is entitled to an award of the foregone €13,872 ($18,615) discount it would have received on Container 6, had CBA not breached the Contract prior to completion of the Container 6 order.  (Dkt. No. 34: Rapp Aff. ¶¶ 17, 24 n.3.)  While this discounted purchase price would be relevant to a calculation of RGI's lost profits, it is not otherwise a separately and independently compensable measure of damages.  <u>E.g.</u>, <u>Semi Conductor Materials, Inc.</u> v. <u>Agric. Inputs Corp.</u>, 96 Civ. 7902, 1998 WL 388503 at *8 (S.D.N.Y. June 23, 1998) (Kaplan, D.J. & Peck, M.J.) (plaintiff's lost profit damages equal to amount plaintiff would have sold products for, less "plaintiff's cost for obtaining the" products (citing 11 Samuel Williston, <u>Williston on Contracts</u> § 1345 (3d ed. 1968))).  (<u>See</u> pages 29-33 below.)

    3.        **Container 6**

RGI seeks $37,779 in damages for the deposit it paid on Container 6, which CBA never shipped.  (Dkt. No. 1: Compl. ¶¶ 35, 46; Dkt. No. 34: Rapp Aff. ¶¶ 11, 18, 20, 24.)  In support of this claim, RGI submits a September 24, 2010 receipt for a wire transfer sent from RGI to CBA ("To: AURIGE S.A.R.L."), in the amount of $37,779 (or €28,154).  (Rapp Aff. Ex. D-1: 9/24/10 Wire Transfer Receipt.)  In addition, RGI submits an order form invoice for Container 6, which states that CBA received a payment of €28,154 on September 28, 2010.  (Rapp Aff. Ex. D-2: 1/7/11 Container 6 Order Form; <u>see also</u> Rapp Aff. Ex. C-7: 7/1/11 Container 6 Invoice.)

RGI's documentary submissions provide a sufficient evidentiary basis from which the Court can determine the amount of RGI's damages with reasonable certainty.  <u>See</u>, <u>e.g.</u>, <u>Agbaje</u> v. <u>Bah</u>, 09 Civ. 6201, 2010 WL 6370541 at *4 (S.D.N.Y. Dec. 23, 2010) ("The purchase receipts . . . allow the Court to determine with reasonable certainty [plaintiff's] damages . . . ."), <u>report & rec.</u>

adopted, 2011 WL 1197641 (S.D.N.Y. Mar. 25, 2011); <u>Homkow</u> v. <u>Musika Records, Inc.</u>, 04 Civ.
3587, 2009 WL 721732 at *9 (S.D.N.Y. Mar. 18, 2009) ("Plaintiff seeks, and is entitled to, general
or compensatory damages representing the monies he paid to Defendants in the expectation that they
would fulfill their obligations under the Budget Agreement. . . . Copies of the checks paid to
Defendants have been submitted to the Court.  In total, Plaintiff is entitled to compensatory damages
in the amount" on the checks.  (record citations omitted)); <u>Int'l Telecom Inc.</u> v. <u>Generadora Electrica
del Oriente, S.A.</u>, 00 Civ. 8695, 2004 WL 784941 at *6 (S.D.N.Y. Apr. 13, 2004) (finding
calculation of damages was "well-supported" by "documentary evidence such as bank wire transfer
confirmations, correspondence, receipts and invoices"); <u>Commercial Union Ins. Co.</u> v. <u>M.V. Breman
Express</u>, 16 F. Supp. 2d 403, 410 (S.D.N.Y. Aug. 17, 1998) ("[T]he undisputed invoice value of a
cargo is sufficient to establish an amount for the calculation of damages." (citing <u>Centennial Ins. Co.</u>
v. <u>M/V Constellation Enter.</u>, 639 F. Supp. 1261, 1265 (S.D.N.Y. 1986) (Weinfeld, D.J.))), <u>aff'd</u>, No.
99-9070, 208 F.3d 202 (table), 2000 WL 298254 (2d Cir. Mar. 21, 2000).

Therefore, RGI should be awarded **$37,779** for its first payment on Container 6.

### 4.    **1.75 Liter Futura Bottles**[25]

RGI seeks $9,892 in damages for the amount it claims to have paid for Futura Bottles
to be shipped in Container 5 that were never received.  (Rapp Aff. ¶¶ 15-16, 24; Paltrowitz Aff. ¶ 14;
Dkt. No. 1: Compl. ¶ 93.)  To substantiate this claim, RGI submits correspondence in which RGI

---

[25]    RGI attempts recovery of damages in connection with its Futura Bottles allegations both
under breach of contract and fraud theories.  (Dkt. No. 33: Paltrowitz Aff. ¶ 14; Dkt. No. 34:
Rapp Aff. ¶ 24.)  Of course, RGI cannot recover damages remedying the same alleged wrong
under two separate theories.  <u>E.g.</u>, <u>Lenard</u> v. <u>Design Studio</u>, 889 F. Supp. 2d 518, 529
(S.D.N.Y. 2012) ("Plaintiff cannot maintain her fraud claim, which is duplicative of her
contract claim.").  (<u>See</u> page 12 n.10 above.)

and CBA discuss the progress of manufacturing the Futura Bottles and their possible inclusion in either Container 5 or Container 6.  (Rapp Aff. Ex. H-1: 11/2/10 Email; Rapp Aff. Ex. H-2: 12/28/10 Email; Rapp Aff. Ex. H-3: 11/25/10 Email; Rapp Aff. Ex. H-4: 10/20/10 Email; Rapp Aff. Ex. H-5: 11/8/10 Email.)  RGI also attaches two wire transfer receipts, which RGI describes as "proof of payment for the Futura Bottles."  (Rapp Aff. ¶ 16; Rapp Aff. Ex. I-1: 10/19/10 Wire Transfer; Rapp Aff. Ex. I-2: 8/19/10 Wire Transfer.)  The Court finds that RGI's submissions are insufficient to establish with reasonable certainty that RGI suffered $9,892 in damages from the Futura Bottles.

As an initial matter, the two wire transfer receipts that RGI represents are proof of the payment for the Futura Bottles are, in actuality, proof of RGI's first and second installment payments on Container 5.  (Rapp Aff. Ex. I-2: 8/19/10 Wire Transfer ("Memo: CONTAINER NO 5"); Rapp Aff. Ex. I-1: 10/19/10 Wire Transfer ("Memo: C5 P2"; "Adjusted payment, Container number FIVE, Pmt 2").)[26]

Moreover, CBA's payment invoice shows that the total price for Container 5's contents was €73,644.  (Rapp Aff. Ex. C-6: 1/17/11 Container 5 Invoice.)  On December 23, 2010, CBA issued an itemized invoice for Container 5, which lists the products (and their prices) that were shipped in Container 5, and reflects a total of €73,644.  (Rapp Aff. Ex. C-4: 12/23/10 Container 5 Invoice.)  Accordingly, because the documents show that RGI received €73,644 worth of products in exchange for the payments it made, there is no basis to award damages.  See, e.g., Lenard v. Design Studio, 889 F. Supp. 2d at 534 ("Plaintiff has not articulated any theory under which she

___

[26]  Aside from the notations on the receipts themselves, the dates and amounts correspond exactly to the dates and amounts of the two Container 5 payments reflected in CBA's January 17, 2011 payment invoice.  (Rapp Aff. Ex. C-6: 1/17/11 Container 5 Invoice; Rapp Aff. Ex. I-1: 10/19/10 Wire Transfer; Rapp Aff. Ex. I-2: 8/19/10 Wire Transfer.)

could possibly be entitled to a refund of amounts she paid for items that were actually provided to her . . . ."); Agbaje v. Bah, 09 Civ. 6201, 2010 WL 6370541 at *5 (S.D.N.Y. Dec. 23, 2010) ("[T]he dock receipt for his consignment contains no mention of shipped goods other than the four cars described above.  The Court finds that the evidence is insufficient to conclude with reasonable certainty that [plaintiff's] consignment included luggage, auto parts, or building materials." (record citation omitted)), report & rec. adopted, 2011 WL 1197641 (S.D.N.Y. Mar. 25, 2011).

### 5.  Balance Of Advanced Payments

RGI also seeks to recover $31,681 for the balance of its advance payments to CBA. (Dkt. No. 34: Rapp Aff. ¶ 24.)  This figure includes €12,900 remaining from "the Container 4 deposit for 375ml bottles," and €7,539 remaining from the €85,000 deposit made under the Contract. (Rapp Aff. ¶ 24 n.4; Dkt. No. 1: Compl. Ex. B: Contract Supp. ¶¶ 1, 3.)  Once again, RGI fails to substantiate these figures with sufficient evidentiary documentation.

As to "the Container 4 deposit for 375ml bottles," not only does RGI fail to substantiate its calculation, but its demand for the purported €12,900 balance is the only mention at all of this supposed advance payment.  (See Rapp Aff. ¶ 24 n.4.)  With regard to the €85,000 deposit, although RGI submitted evidence sufficient to establish that it paid the advance and thus was entitled to have it applied to its future orders (Rapp Aff. Ex. G-2: 1/30/08 Wire Transfer; Compl. ¶ 13 & Ex. B: Contract Supp. ¶¶ 1, 3), RGI nevertheless fails to offer any evidence establishing how much of the €85,000 deposit has been applied to each of its orders.  There is no identifiable basis for RGI's conclusion that a €7,539 balance remains.[27]

---

[27]    The Court undertook to try to extrapolate RGI's calculation of the €7,539 balance from the
(continued...)

Accordingly, RGI should not be awarded any damages for deposit balances.

**6.     Lost Profits**

RGI seeks lost profit damages in the amount of $600,000.  (Dkt. No. 33: Paltrowitz Aff. ¶ 12; see also Dkt. No. 34: Rapp Aff. ¶¶ 29-30; Dkt. No. 1: Compl. ¶ 85.)  RGI proffers the following explanation for its calculation of the $600,000 amount:

> Based on the records of profits made by RGI during the two-plus years that it was able to promote and sell the Products relatively unhindered, and the inquiries and orders that it received that it could not fulfill due to lack of inventory, and the percentage growth in profits over ten quarters when sales were made with a sufficient inventory of goods [Q1 2009-Q4 2010 and Q3-Q4 2011 (after Container 5 was placed into inventory and before some Products ran out of stock)], Affiant believes that it is reasonable to predict that, had [CBA] fulfilled its obligations pursuant to the Exclusive Agreement and the Supplemental Agreement, RGI would have earned profits of at least $600,000.00 during the holiday season of 2010 and the years 2011 through 2015, the renewal date of the seven-year agreement.

(Rapp Aff. ¶ 29.)  RGI claims that "[c]opies of proofs of profit and loss statements regarding sales of the Products for the above-referenced ten quarters in which sales were made are annexed as

---

(...continued)
invoices that expressly indicate where funds from the €85,000 deposit are applied.  (See, e.g., Rapp Aff. Ex. C-6: 1/17/11 Container 5 Invoice & Ex. D-2: 1/7/11 Container 6 Order Form.)  However, the Court's efforts were thwarted by RGI's failure to submit even a comprehensive set of invoices, notwithstanding that it purported to do so.  (See Rapp Aff. ¶ 10: "Copies of the six (6) orders are annexed as Exhibit 'C-1 through C-7'.")  One form—the July 31, 2008 invoice—is not related to any of RGI's six orders, but rather relates to bottles CGA brought during a trip to the United States.  (Rapp Aff. Ex. F: 4/19/11 Memo ¶ 5 ("When Patrick came in 2008 he brought 10 cases with him.  RGI was invoiced and paid for the bottles + the shipping expenses."); Rapp Aff. Ex. C-1: 7/31/08 Invoice (showing price for "10 boxes" plus "global transport" costs).)  Of the other six forms that RGI submits as proof of the six orders, four pertain to Containers 5 and 6.  (Rapp Aff. Ex. C-4: 12/23/10 Container 5 Invoice (€73,644); Rapp Aff. Ex. C-5: 9/6/10 Containers Breakdown (Containers 5 and 6); Rapp Aff. Ex. C-6: 1/17/11 Container 5 Invoice (€73,644); Rapp Aff. Ex. C-7: 7/1/11 Container 6 Invoice.)  The remaining two forms relate to Container 1 (Rapp Aff. Ex. C-2: 8/23/08 Container 1 Invoice) and Container 3 (Rapp Aff. Ex. C-3: 2/1/09 Container 3 Invoice), leaving no evidence at all of the Container 2 or Container 4 orders.

Exhibit 'P'."  (Rapp Aff. ¶ 30.)  What is actually attached as Exhibit P, however, is a four-by-four table containing a total gross profit number for each quarter from 2009 through 2012, with a calculation of the total gross profit for each year.  (Rapp Aff. Ex. P: Dragon Bleu Vodka Gross Profit by Quarter.)  RGI's evidence is insufficient to prove its lost profits with reasonable certainty.[28]

As an initial matter, RGI cannot rely on gross profits alone, as it has chosen to do (see Rapp Aff. Ex. P: Dragon Bleu Vodka Gross Profit by Quarter), to establish reasonably certain lost profit damages.  See, e.g., Healing Power, Inc. v. Ace Cont'l Exps., Ltd., No. 07-cv-4175, 2008 WL 4693246 at *8 (E.D.N.Y. Oct. 17, 2008) (Plaintiff's "calculation of lost profits is based on an incorrect formula, as courts 'have generally rejected the use of gross receipts or gross profits as a means of establishing the value of a loss or injury to business interests.'  Plaintiff's calculation of lost profits is predicated solely on the amount of gross receipts from customers, not the net profit.  Plaintiff's measurements fail to take into account the costs of running a business, market fluctuations over the course of fifteen years and a host of other variables that would almost certainly change customers' purchasing patterns." (citations omitted)); S.A.B. Enters., Inc. v. Vill. of Athens, 164 A.D.2d 558, 565, 564 N.Y.S.2d 817, 822 (3d Dep't 1991); see also, e.g., Millenium Expressions, Inc. v. Chauss Mktg., Ltd., 02 Civ. 7545, 2007 WL 950070 at *7 (S.D.N.Y. Mar. 30, 2007) (lost profits

---

[28]     Under New York law, RGI may recover lost profits "only if [it] can establish both the existence and amount of such damages with reasonable certainty."  Schonfeld v. Hilliard, 218 F.3d 164, 172 (2d Cir. 2000); accord, e.g., Care Travel Co. v. Pan Am. World Airways, Inc., 944 F.2d 983, 994 (2d Cir. 1991); ACCD Global Agric. Inc. v. Perry, 12 Civ. 6286, 2013 WL 840706 at *5 (S.D.N.Y. Mar. 1, 2013); Int'l Telecom, Inc. v. Generadora Electrica del Oriente, S.A., 00 Civ. 8695, 2004 WL 784941 at *3 (S.D.N.Y. Apr. 13, 2004); Galloping, Inc. v. QVC, Inc., 27 F. Supp. 2d 466, 468 (S.D.N.Y. 1998); Kenford Co. v. Cnty. of Erie, 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 132 (1986).

cannot be determined by simply "averaging the sales that [plaintiff] made in the past and projecting them into the future").[29]

Further, nowhere does RGI explain how it calculated the projected $600,000 lost profits from the gross profit numbers contained in Exhibit P. Even assuming RGI's formula was discernable, RGI provides no support for any of the factors necessary to compute an accurate projection, such as a basis for projected future orders, or the likelihood of continuing profit growth at the rate reflected in the previous quarters.[30] Such "[p]rojections of future profits based upon 'a multitude of assumptions' that require 'speculation and conjecture' and few known factors do not provide the requisite certainty." Schonfeld v. Hilliard, 218 F.3d at 172; accord, e.g., Lenard v. Design Studio, 889 F. Supp. 2d 518, 536 (S.D.N.Y. 2012); Summit Props. Int'l, LLC v. Ladies Prof'l

---

[29]    Even with more thorough documentation, it is questionable whether, as a matter of law, RGI could rely on a mere ten-quarter history to project five years of lost profits for a relatively new business venture. See, e.g., Upper Deck Co. v. BreaKey Int'l, BV, 390 F. Supp. 2d 355, 360 (S.D.N.Y. 2005) ("The data on which [defendant] relies provide an insufficient historical record upon which to project future earnings." (& cases cited therein)); Int'l Telecom, Inc. v. Generadora Electrica del Oriente, S.A., 2004 WL 784941 at *4 (Plaintiff "seeks to project eight years of lost profits based on only two months revenues in a new business venture."); see also ACCD Global Agric. Inc. v. Perry, 2013 WL 840706 at *5 ("Indeed, for 100 years, the New York Court of Appeals has been 'reluctant' to award lost profits in cases involving new business ventures.").

[30]    In this regard, the Court notes that RGI's evidentiary submissions indicate that future profits were uncertain, at best. (Rapp Aff. Ex. F: 4/19/11 Memo ¶ 1(3) ("We note that the level of repeat sales is unknown. We also note that overall sales levels from year to year by state often varies widely: your 2011 expectations show Ohio declining to zero, and Illinois declining significantly."); id. ¶ 1(4) ("Your expected future sales are disappointingly low notwithstanding expansion into other States."); id. ¶ 2 ("We maintain our position due to the lack of sales and perspectives. Aurige cannot be expected to support further safety stock with no credible sales projections."); id. ¶ 11 ("And now we notice a low level of sales, a strategy we don't trust and low perspectives.").) Indeed, the lost profits spreadsheet itself (Rapp Aff. Ex. P) shows wide fluctuations in annual and quarterly profits.

Golf Ass'n, 07 Civ. 10407, 2010 WL 2382405 at *3-4 (S.D.N.Y. June 14, 2010); Millenium

Expressions, Inc. v. Chauss Mktg., Ltd., 2007 WL 950070 at *7 ("The only testimony supporting

the lost profits claim was that of [plaintiff's principal]; no economist or other expert provided

evidence. [Plaintiff's principal's] analysis consisted solely of averaging the sales that [plaintiff] made

in the past and projecting them into the future.  He did not take into account other confounding

factors that would explain [plaintiff's] losses, a fatal flaw in light of the fact that the market

fluctuated constantly . . . .  Any award of lost profits here would be entirely speculative." (citation

omitted)); Kenford Co. v. Cnty. of Erie, 67 N.Y.2d at 262-63, 502 N.Y.S.2d at 133.[31/]

---

[31/]    See also, e.g., Int'l Telecom, Inc. v. Generadora Electrica del Oriente, S.A., 2004 WL
784941 at *4 ("[A]lthough [plaintiff's] documentation of its two months of profits is
thorough, it nevertheless fails to meet the requirement of reasonable certainty because it rests
on 'a host of speculative assumptions and few known figures.'  Before accepting [plaintiff's]
projected lost profit figures, this Court would be obligated to make speculative assumptions,
including that the parties operated successfully under the Service Agreement for eight years
without competition, regulatory changes, technological developments, or service
interruption, and that all projected expenses would have proved correct.  Accordingly, this
Court finds that [plaintiff] is not entitled to lost profit damages attributable to defendants'
breach of the Service Agreement." (citations omitted)); Shred-It USA, Inc. v. Mobile Data
Shred, Inc., 238 F. Supp. 2d 604, 609, 611 (S.D.N.Y. 2002) ("[T]he Court is not persuaded
by [plaintiff's] request insofar as it posits a straight-line stream of revenues assumed to
remain constant for five years. [Plaintiff] produced no evidence to warrant an assumption
either that its projection of income from the six remaining lost customers would remain at
a uniform level or that this result would continue for five years. . . . [N]either did [plaintiff]
provide factual support grounded on more than its own income results during the first seven
months of the current year to sustain a reasonable inference that the contribution margin of
61 percent it applies to calculate asserted damages would remain constant for each of the
next five years. . . . The world of time and events, in business no less so than in any other
aspect of life, is not as static and rectilinear as [plaintiff] would have it."), aff'd, 92 F. App'x
812 (2d Cir. 2004); 11 Corbin on Contracts § 56.17 (2012) ("[P]roof of lost profits in a new
business will be more difficult, but such damages may be established through expert
testimony, economic and financial data, market analyses, records of similar enterprises and
other relevant comparisons.").

Accordingly, having failed to establish any amount of lost profits with reasonably certainty, RGI should not be awarded any amount for such damages.

### 7.     Promotional Assistance

RGI seeks to recover $55,000 in damages based on its claim that CBA failed to provide promotional assistance and support in violation of paragraph 2(a) of the Contract.  (Dkt. No. 34: Rapp Aff. ¶ 25; Dkt No. 33: Paltrowitz Aff. ¶¶ 10-11; Dkt. No. 1: Compl. ¶¶ 72, 76 & Ex. A: Distrib. Contract ¶ 2(a).)   RGI claims to have spent "over $110,000 in promotional costs and expenses," and as a result of CBA's breaches, "RGI has lost the full value of these promotional costs and expenses."  (Rapp Aff. ¶ 25.)  RGI proffers that its damages on this claim should be what it describes as the cost of "a reasonable cooperative participation" on CBA's part, which RGI has summarily determined (without any cited authority or basis) is equal to half of the amount RGI spent on promotional expenses, or approximately $55,000.  (Rapp Aff. ¶ 25.)

As an initial matter, RGI makes no attempt to explain why this calculation of damages is an appropriate remedy for this alleged breach.  That is, to the extent RGI is conceding that these promotional expenses were not incurred as a consequence of CBA's breach, but rather are compensable damages because RGI lost the value of these expenditures when CBA breached the Contract, then RGI's damages would be its future lost profits and not the cost (or half the cost) of the promotional expenditures.  See, e.g., Upper Deck Co. v. BreaKey Int'l, BV, 390 F. Supp. 2d 355, 362 (S.D.N.Y. 2005) (Defendant "seeks to recover the unspent portion of the $6 million [plaintiff] was required to spend on marketing and advertising over the two-year term of the Agreement. . . . The damages in a breach of contract action are generally measured by the non-breaching party's

actual loss.  Here, the actual loss to [defendant] was the value to the [defendant's] brand that the advertising would have generated." (citation omitted)).[32]

To the extent RGI is alleging that it incurred these promotional expenditures as a consequence of CBA's breach, i.e., CBA's failure to "provide additional technical and  promotional assistance" under paragraph 2(a) of the Contract, RGI fails to explain which expenses listed in its attachment should have been borne by CBA under paragraph 2(a) of the Contract, and not by RGI under paragraph 1.  See, e.g., Lenard v. Design Studio, 889 F. Supp. 2d 518, 537-38 (S.D.N.Y. 2012).

RGI's only supporting exhibit is a simple table listing the vendor, purpose, and amount of each alleged promotional expenditure; there are no invoices, wire transfer confirmations, receipts or evidence in any other form proving that the amounts reflected in the table are accurate, that RGI actually made any of these payments, or why CBA and not RGI should be responsible for those promotional expenses.  (Rapp Aff. Ex. R-1: Promotional Dollars Spent by RGI on the Dragon

---

[32]    In this regard, the Court notes that even if properly valued, awarding the lost value of RGI's promotional expenditures would be double counting if awarded separately from RGI's lost profits damages.  See, e.g., Semi Conductor Materials, Inc. v. Agric. Inputs Corp., 96 Civ. 7902, 1998 WL 388503 at *9 (S.D.N.Y. June 23, 1998) (Kaplan, D.J. & Peck, M.J.) ("Plaintiff also seeks damages of approximately $240,000 in bank fees, travel expenses and other miscellaneous expenses.  The various bank fees set out in paragraph 23(b)-(d) of [plaintiff's president's] affidavit are not recoverable.  They are fees that plaintiff would have paid, without reimbursement, if [defendant] had not breached the contract.  Thus, allowing plaintiff to recover its lost profits and these fees would place plaintiff in a better position than if the contract had been performed.  The Court will not allow this double counting. Similarly, plaintiff may not recover the damages sought for its travel, lodging, telephone and fax expenses.  These amounts either are the costs of entering into and performing the AIC agreement—and hence a necessary expense to generate the lost profits which the Court is awarding as damages—or if post-[defendant's] default, are akin to legal fees, which are not recoverable in a breach of contract action." (citations & fn. omitted)).

Bleu Vodka Brand.)[33]  Without more, RGI's statement of the amount of damages—whether made in an affidavit or a chart attached to an affidavit—is an insufficient basis on which to award promotional damages.  (See cases cited at page 14 above.)  See also, e.g., Grand Fia Inc. v. Hakakin, 11 Civ. 2578, 2012 WL 3578175 at *8 (S.D.N.Y. Aug. 13, 2012) (Plaintiff's "affidavit, without any corroborating evidence, is not sufficient to establish, with reasonable certainty, the amount of [plaintiff's] additional advertising and promotional activities that resulted from the defendants' infringement. . . . [Plaintiff] did not sustain its burden of showing the amount of damages with reasonable certainty, namely, its lost profit and additional advertising and promotional expenses.  Therefore, awarding damages to [plaintiff] is not warranted."); Billion Tower Int'l, LLC v. MDCT Corp., 08 Civ. 4185, 2010 WL 5536513 at *9 (S.D.N.Y. Dec. 10, 2010) (lost profits not proved where plaintiff "provides the Court with two charts containing projected sales, costs, and profits but fails to provide any substantiation for the numbers contained therein"), report & rec. adopted, 2011 WL 43458 (S.D.N.Y. Jan. 6, 2011).  RGI should not be awarded damages on its promotional assistance claims.

### 8.    Raw Materials

RGI seeks $138,348 in damages related to CBA's alleged failure to use its best efforts to obtain raw materials at the lowest possible price as required by paragraph 3(a) of the Contract. (Dkt. No. 33: Paltrowitz Aff. ¶ 15; Dkt. No. 34: Rapp Aff. ¶ 31; see also Dkt. No. 1: Compl. ¶¶ 73-74, 95-96 & Ex. A: Distrib. Contract ¶ 3(a).)  RGI claims that the products could have been

---

[33]    The second exhibit RGI cites to support this claim appears to be a vertical printout of the exact same table of expenses that displays horizontally in Exhibit R-1.  (Rapp Aff. ¶ 25 & Ex. R-2: Promotional Dollars Spent by RGI on the Dragon Bleu Vodka Brand.)

produced for $3.17 per 750 milliliter bottle, which is $1.83 per bottle less than CBA charged under the Contract.[34]  The $3.17 figure is comprised of $1.00 "for contract packing/bottling" (Rapp Aff. ¶ 31), $1.58 for decorated bottles and cartons (Rapp Aff. ¶ 31 & n.5), $0.15 for corks (Rapp Aff. ¶ 31 & n.6), and $0.44 for vodka (Rapp Aff. ¶ 31 & n.7).

As an initial matter, RGI offers no evidence whatsoever to substantiate its claim that "[t]he industry-standard charge for contract packing/bottling distilled spirits is approximately $1 per bottle." (Rapp Aff. ¶ 31.)  A plaintiff's unsupported statement is an insufficient basis for awarding damages.  (See cases cited at page 14 above.)

In support of the figures used for bottles, corks and vodka, RGI attaches one price quote each, rendered on August 10, 2011 (Rapp Aff. Ex. Q-3: Westpack Bottle Quote), May 10, 2012 (Rapp Aff. Ex. Q-1: Tapi Cork Quote), and February 14, 2013 (Rapp Aff. Ex. Q-2: Ultra Pure Vodka Quote), respectively.  These price quotes do not provide a sufficient basis for determining an amount of damages based on CBA's alleged overpricing or overpaying for these raw materials.

First, RGI offers no evidence suggesting that these 2011, 2012 and 2013 price quotes are representative of the price of these raw materials at the time they were purchased by CBA including, for example, in early 2008 when the majority of raw materials were purchased.  (See Compl. Ex. B:  Contract Supp. ¶ 1.)[35]  Second, RGI attaches no evidence to show that these price

---

[34]  Although not explained, the Court assumes this calculation was made by converting the €3.70 price per bottle set forth in the Contract (Distrib. Contract ¶ 3(a)) at the current 1.35 exchange rate (Rapp Aff. ¶ 31 nn.5-7), yielding a Contract-based price per bottle of $4.995, which CBA rounds up to $5.00, and then subtracts the asserted lower price per bottle of $3.17, to yield a difference of $1.83.

[35]  "In all cases in which valuation in dollars is required, compensation for the plaintiff's losses is to be made with reference to the conditions existing at the time when performance is due
(continued...)

quotes are for "the appropriate quality of raw materials" as required under the Contract.  (Distrib.

Contract ¶ 3(a).)  Third, RGI fails to explain how these price quotes would actually compare to

CBA's prices, such as how the costs of shipping the materials to France would factor into the quoted

prices,[36] or the extent to which the price quotes would be affected by orders of smaller quantities

than, for example, the 22,880 unit order size quoted by Westpack.  (See Rapp Aff. Ex. Q-3:

Westpack Bottle Quote ("Initial order (units): 22,880").)

       Fourth, RGI calculates its requested $138,348 figure by multiplying the claimed

$1.83 difference in price per bottle by "an equivalent of 15,120 750ml bottles per container

purchased, for a total of 75,600 bottles."  (Rapp Aff. ¶ 31.)  RGI's orders clearly were not limited

to 750 milliliter bottles, and absent evidence showing that the prices are comparable for raw

materials used to manufacture other bottle sizes, RGI cannot simply apply this 750 milliliter

calculation to all bottles ordered.  (See Rapp Aff. Ex. C-3: 2/1/09 Container 3 Invoice (included 50

mL and 1 L size bottles);  Rapp Aff Ex. C-4: 12/23/10 Container 5 Invoice (included 50 mL and 1

L size bottles).)

       Accordingly, because RGI has failed to submit sufficient evidence showing a

reasonably certain amount of damages sustained as a result of CBA's alleged failure to obtain raw

materials at the lowest possible price, no damages should be awarded on this claim.  Cf., e.g., Lenard

v. Design Studio, 889 F. Supp. 2d 518, 534 (S.D.N.Y. 2012) (Plaintiff "has not submitted any

---

[35]    (...continued)
      and the contract is broken."  11 Corbin on Contracts § 55.14 (2012).

[36]    It appears that the quoted companies would have to ship the materials from outside of
    France.  (Rapp Aff. Ex. Q-1: Tapi Cork Quote ("Ship Via FOB Mexico City"); Rapp Aff.
    Ex. Q-3: Westpack Bottle Quote ("These prices are FOB our plant in Czech Republic.").)

evidence to demonstrate that . . . $50,000 was a reasonable market rate for the services performed."); Laish, Ltd. v. Jafora-Tabori, Ltd., No. 02 CV 1322, 2006 WL 270250 at *9 (E.D.N.Y. Feb. 1, 2006) ("Nor is Defendant entitled to summary judgment of Plaintiff's breach of contract claim with respect to pricing because the record lacks evidence regarding the price of raw materials, which bears directly on the reasonableness of Defendant's pricing.").

### 9. Damages Total

In sum, RGI should be awarded damages of $57,940 – $20,161 for Container 1 (see page 20 above), and $37,779 for Container 6 (see page 26 above).

### C. RGI Is Entitled To Interest On Its Breach Of Contract Damages

Under New York law,[37] prejudgment interest should be awarded in breach of contract cases. C.P.L.R. § 5001(a) ("Interest shall be recovered upon a sum awarded because of a breach of performance of a contract . . . ."); see, e.g., NML Capital v. Republic of Arg., 621 F.3d 230, 239 (2d Cir. 2010); U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co., 369 F.3d 34, 78 (2d Cir. 2004); New Eng. Ins. Co. v. Healthcare Underwriters Mut. Ins. Co., 352 F.3d 599, 606 (2d Cir. 2003); Adams v. Lindblad Travel, Inc., 730 F.2d 89, 93 (2d Cir. 1984) ("Under the law of New York, therefore, prejudgment interest is normally recoverable as a matter of right in an action at law for breach of contract."); Bulk Oil (U.S.A.), Inc. v. Sun Oil Trading Co., 697 F.2d 481, 484-85 (2d Cir. 1983) ("The award of statutory pre-verdict interest under N.Y. [C.P.L.R. § 5001] is founded on the fact that the aggrieved party has been damage[d] by a loss of the use of money or its equivalent and that

---

[37] Paragraph 10 of the Contract states: "This Agreement shall be governed and construed by the laws of the State of New York . . . ."  (Dkt. No. 1: Compl. Ex. A: Distrib. Contract ¶ 10.)

unless interest is added the party aggrieved is not made whole.  Statutory interest is compensation for the use of money.").[38/]  The statutory interest rate in New York is 9%.  C.P.L.R. § 5004.

   RGI seeks interest on its damages from February 23, 2012, the date it commenced this action.  (Dkt. No. 33: Paltrowitz Aff. ¶ 17(III); Dkt. No. 34: Rapp Aff.  p. 9 ¶ III; see Dkt. No. 1: Compl.)  Accordingly, the Court recommends that RGI be awarded prejudgment interest from February 23, 2012, to the date of judgment at the statutory rate of 9% per annum.  See, e.g., Nwagboli v. Teamwork Transp. Corp., 08 Civ. 4562, 2009 WL 4797777 at *12 (S.D.N.Y. Dec. 7, 2009) ("The plaintiffs seek prejudgment interest from May 16, 2008, the date on which they commenced this action. . . . The interest is to be calculated by the Clerk of Court, at a rate of nine per centum per annum, from May 16, 2008, until the entry of judgment.").

   In light of the above, RGI is entitled to **$6,000** in prejudgment interest through the date of this Report & Recommendation (April 18, 2013),[39/] plus a per diem rate of $14.287 until judgment is entered, together with postjudgment interest pursuant to 28 U.S.C. § 1961.[40/]

---

[38/] See also, e.g., Mestousis Enters. Inc. v. Concord Blue Inc., 11 Civ. 3384, 2012 WL 254987 at *2 (S.D.N.Y. Jan. 27, 2012) (Peck, M.J.), report & rec. adopted, 2012 WL 1193752 (S.D.N.Y. Apr. 10, 2012); Hounddog Prods., L.L.C. v. Empire Film Grp., Inc., 826 F. Supp. 2d 619, 630 (S.D.N.Y. 2011); Silge v. Merz, 05 Civ. 3648, 2005 WL 2387482 at *2 (S.D.N.Y. Sept. 29, 2005) (Peck, M.J.), report & rec. adopted, 2006 WL 39632 (S.D.N.Y. Jan. 6, 2006), aff'd, 510 F.3d 157 (2d Cir. 2007).

[39/] The Court used the following formula to calculate RGI's prejudgment interest award: $57,940 in contract damages x .09 interest per annum = $5,214 ÷ 365 days in one year = $14.287 per diem x 420 days (from February 23, 2012 until April 18, 2013) = $6,000.

[40/] See, e.g., Opulen Ventures, Inc. v. Axcessa, LLC, No. 12-CV-01776, 2013 WL 829230 at *4 & n.2 (E.D.N.Y. Jan. 22, 2013) (citing Schipani v. McLeod, 541 F.3d 158, 164-65 (2d Cir. 2008)), report & rec. adopted, 2013 WL 828922 (E.D.N.Y. Mar. 6, 2013); Murphy v. Snyder, No. CV 10-1513, 2012 WL 4483025 at *5 (E.D.N.Y. Mar. 28, 2012) ("As an award of post judgment interest is mandatory, the court recommends an award of such interest at

                (continued...)

**D.**     **RGI Is Entitled To $1,216 In Costs**

      RGI seeks attorneys' fees and costs under Fed. R. Civ. P. 54, including $1,636 incurred for service of process on CBA in France resulting from CBA's refusal to waive service pursuant to Fed. R. Civ. P. 4. (Dkt. No. 33: Paltrowitz Aff. ¶¶ 17(II)-17(IV); Dkt. No. 34: Rapp Aff. p. 9 ¶¶ II-IV; Dkt. No. 1: Compl. Wherefore ¶ J.)

      **1.**     **RGI Is Not Entitled To Attorneys' Fees**

      RGI does not provide any explanation of why it should be entitled to attorneys' fees. (See generally Dkt. No. 35: RGI Br.) Unless a contract provides for attorneys' fees, the "American Rule" is that attorneys' fees are not available in breach of contract actions. See, e.g., Summit Valley Indus., Inc. v. United Bhd. of Carpenters & Joiners, 456 U.S. 717, 721, 102 S. Ct. 2112, 2114 (1982); E*Trade Fin. Corp. v. Deutsche Bank AG, 374 F. App'x 119, 123 (2d Cir. 2010); U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co., 369 F.3d 34, 74 (2d Cir. 2004); Mestousis Enters. Inc. v. Concord Blue Inc., 11 Civ. 3384, 2012 WL 254987 at *4 (S.D.N.Y. Jan. 27, 2012) (Peck, M.J.), report & rec. adopted, 2012 WL 1193752 (S.D.N.Y. Apr. 10, 2012).

      RGI is not entitled to recover attorneys' fees here, since the Contract contains no provision for such an award, and RGI has not pointed to any other basis for such an award. See, e.g., Lenard v. Design Studio, 889 F. Supp. 2d 518, 537 (S.D.N.Y. 2012) ("'Generally, absent express contractual or statutory provisions to the contrary, attorney's fees are not recoverable as damages,' and Plaintiff has cited no contractual or statutory provision that would warrant an award of attorney's fees in this case. . . . I recommend that Plaintiff's request for attorney's fees be denied."

---

40/     (...continued)
the statutory rate prescribed by 28 U.S.C. § 1961(a)." (citation omitted)).

(citations omitted)); <u>Agbaje</u> v. <u>Bah</u>, 09 Civ. 6201, 2010 WL 6370541 at *6 (S.D.N.Y. Dec. 23, 2010), <u>report & rec. adopted</u>, 2011 WL 1197641 (S.D.N.Y. Mar. 25, 2011).

**2.      Costs**

To substantiate its costs, RGI describes the expenses it incurred in serving CBA in France as a result of CBA's refusal to waive service pursuant to Fed. R. Civ. P. 4.  (Dkt. No. 33: Paltrowitz Aff. ¶¶ 2-3.)  RGI attaches an invoice from a French process server and a wire transfer receipt showing that $1,216 was paid to the process server.  (Paltrowitz Aff. ¶¶ 2-3 & Ex. A: 5/31/12 Process Server Invoice & Wire Transfer.)  Because the requested amount is substantiated by the documentary evidence, RGI should be awarded $1,216 for this cost.  <u>See, e.g.</u>, <u>Mestousis Enters. Inc.</u> v. <u>Concord Blue Inc.</u>, 11 Civ. 3384, 2012 WL 254987 at *4 (S.D.N.Y. Jan. 27, 2012) (Peck, M.J.) (costs awarded where the "costs were substantiated by receipts"), <u>report & rec. adopted</u>, 2012 WL 1193752 (S.D.N.Y. Apr. 10, 2012); <u>A I Marine Adjusters, Inc.</u> v. <u>M/V SIRI BHUM</u>, 05 Civ. 7227, 2007 WL 760415 at *6 (S.D.N.Y. Feb. 8, 2007).

As to the $420 in attorneys' fees related to service on CBA in France (Paltrowitz Aff. Ex. B: 7/20/12 Attorney Invoice), these fees are not compensable costs.  <u>See, e.g.</u>, <u>Hooda</u> v. <u>W.C.A. Servs. Corp.</u>, No. 11-CV-00504, 2011 WL 6019932 at *3 (W.D.N.Y. Nov. 4, 2011) ("The time of the attorney in arranging for formal service after the defendant has refused a waiver is not a compensable item." (quotations omitted)), <u>report & rec. adopted</u>, 2011 WL 6012528 (W.D.N.Y. Dec. 1, 2011); <u>A I Marine Adjusters, Inc.</u> v. <u>M/V SIRI BHUM</u>, 2007 WL 760415 at *6 ("Attorney's fees incurred in the process of effecting service cannot be recovered under Rule 4(d)(5).").

Accordingly, RGI should be awarded a total of **$1,216** in costs.

## CONCLUSION

For the reasons set forth above, RGI's motion (Dkt. No. 32) should be <u>GRANTED</u> as modified herein: judgment should be entered for RGI against CBA on default, CBA's counterclaims should be dismissed with prejudice, and RGI should be awarded:  breach of contract damages in the amount of $57,940; $6,000 in prejudgment interest through the date of this Report & Recommendation (April 18, 2013), plus $14.287 per day until judgment is entered together with postjudgment interest pursuant to 28 U.S.C. § 1961; and $1,216 in costs.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  <u>See also</u> Fed. R. Civ. P. 6.  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Lorna G. Schofield, 40 Foley Square, Room 201, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Schofield (with a courtesy copy to my chambers).  Failure to file objections will result in a waiver of those objections for purposes of appeal.  <u>Thomas</u> v. <u>Arn</u>, 474 U.S. 140, 106 S. Ct. 466 (1985); <u>Ingram</u> v. <u>Herrick</u>, 475 F. App'x 793, 793 (2d Cir. 2012); <u>IUE AFL-CIO Pension Fund</u> v. <u>Herrmann</u>, 9 F.3d 1049, 1054 (2d Cir. 1993), <u>cert. denied</u>, 513 U.S. 822, 115 S. Ct. 86 (1994); <u>Roldan</u> v. <u>Racette</u>, 984 F.2d 85, 89 (2d Cir. 1993); <u>Frank</u> v. <u>Johnson</u>, 968 F.2d 298, 300 (2d Cir.), <u>cert. denied</u>, 506 U.S. 1038, 113 S. Ct. 825 (1992); <u>Small</u> v. <u>Sec'y of Health & Human Servs.</u>, 892 F.2d 15, 16 (2d Cir.

43

1989); <u>Wesolek</u> v. <u>Canadair Ltd.</u>, 838 F.2d 55, 57-59 (2d Cir. 1988); <u>McCarthy</u> v. <u>Manson</u>, 714 F.2d

234, 237-38 (2d Cir. 1983).

Dated:      New York, New York
                April 18, 2013

                                            Respectfully submitted,

                                            _____

                                            **Andrew J. Peck**
                                            United States Magistrate Judge

Copies to:     Cognac Brisset-Aurige S.a.r.l. (Email)
                All Counsel (ECF)
                Judge Lorna G. Schofield